# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DAVID J. WROBEL, ) | |
| ) | |
| Plaintiff, ) | No. 17 cv 3129 |
| ) | |
| v. ) | Magistrate Judge Susan E. Cox |
| ) | |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff David J. Wrobel ("Plaintiff") appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his disability benefits under Title II of the Social Security Act. The Parties have filed cross motions for summary judgment. For the reasons detailed below, the Commissioner's Motion for Summary Judgment (dkt. 19) is granted and Plaintiff's motion (dkt. 12) is denied.

## I. Background

### a. Procedural History

On March 19, 2013, Plaintiff applied for Title II disability insurance benefits, alleging disability since December 28, 2011. (Administrative Record ("R.") 235-38). On March 20, 2013, Plaintiff changed his disability onset date to December 30, 2011. (R. 242-43). Plaintiff's claim was denied initially and again at the reconsideration stage. Plaintiff timely requested an administrative hearing, which was held before Administrative Law Judge ("ALJ") Karen Sayon on August 24, 2015 and November 23, 2015.[1] (R. 45-53, 56-91, 133-34). Plaintiff was represented by counsel, and a Vocational Expert ("VE") testified during the hearing. (R. 56-91). On January 7, 2016, the ALJ issued a written decision denying Plaintiff disability

---

[1] The August 24, 2015 administrative hearing was continued because the medical record was incomplete, and thus the focus of that short hearing was on what documentation was missing. Therefore, the Court refers to the substantive November 23, 2015 hearing as the "administrative hearing" throughout this Memorandum Opinion and Order.

benefits. (R. 20-32). On March 3, 2017, the Appeals Council denied Plaintiff's appeal, and the ALJ's decision became the final decision of the Commissioner. (R. 1-6). Plaintiff filed the instant action on April 26, 2017. (Dkt. 1).

### b. Plaintiff's Background

On December 30, 2011, the alleged disability onset date, Plaintiff injured his right shoulder while driving a forklift at work. (R. 476). He was diagnosed with a rotator cuff partial thickness tear, impingement, bicep tendonitis, and AC joint pain. (R 481). In April 2012, Plaintiff underwent surgery on the shoulder because he was still reporting neck pain resulting in radicular symptoms bilaterally and weakness in the hands bilaterally. (R. 444-46, 462-65). By September 24, 2012, the treatment records indicate that Plaintiff's symptoms had completely resolved and he had good functioning upon physical examination (R. 444-46). By November 27, 2012, Plaintiff exhibited only minor deficits, and he reported during a September 10, 2012, physical therapy session that his shoulder felt "wonderful." (R. 371, 433). By mid-2012 he was able to golf. (R. 356, 383, 415; *see also*, fn. 3, *infra*, discussing the frequency of Plaintiff's self-reports of golf to his treating physicians). On December 17, 2012, he was discharged from physical therapy with his right shoulder at 90 percent of normal with the ability able to perform all activities of daily living with no complaints. (R. 398, 402).

On January 8, 2013, Plaintiff exhibited excellent range of motion in his shoulder. (R. 636). On that same date, an unsigned Work Status Report was issued that states that as of January 9, 2013, Plaintiff would be able to "return to regular work/activity with no restrictions," but also states that Plaintiff had "no restrictions from shoulder standpoint, [but] permanent restrictions from cervical spine." (R. 426, 494, 579). This Work Status Report, however, does not specify what the "permanent restrictions" are. *Id*. During a Vocational Rehabilitation Evaluation on July 30, 2013, Plaintiff reported that he experienced fatigue from medications, that he could only stand for five minutes due to neck and back pain, and that he had problems with losing grip in his hands. (R. 619). On September 17, 2013, Plaintiff underwent a left-side cervical radiofrequency ablation with his pain management physician, Anas Alzoobi, M.D.,

2

because Plaintiff's pain had recently returned; Plaintiff had good results with this procedure on a prior occasion, where his pain was abated for six to seven months. (R. 628). On October 8, 2013, Plaintiff reported only "modest pain" after his recent radiofrequency ablation procedure, yet Dr. Alzoobi indicated that Plaintiff had severe neck pain, discogenic disease, spinal stenosis, and status post cervical fusion with aggravation from a work injury. (R. 627). On September 16, 2014, Plaintiff continued to report chronic neck pain with radiation to his right upper extremity, and underwent an epidural steroid injection. (R. 730-31). On January 6, 2015, Plaintiff underwent cervical spine surgery. (R. 757-59).

On October 22, 2015, Plaintiff presented to the Presence Saint Joseph Medical Center emergency department with complaints of low back and left hip pain that began seven days prior while doing some work in the yard and some lifting. (R. 837-42). At that time, Plaintiff also reported that he had been to the Silver Cross emergency department two days prior for the same complaint and was told his CT scans were normal.[2] (R. 837). The X-rays from his October 22, 2015 visit showed extensive lumbar spondylosis with moderate facet arthritis at the L4-L5 level, and Plaintiff was diagnosed with a lumbar spine strain. (R. 838, 841).

Finally, we must also note that during October 2013, Plaintiff attended four counseling sessions through Crossroads Counseling Services during which Dawn Kusinski, Psy.D., noted that Plaintiff was depressed with reported suicidal ideation secondary to constant worries about money and neck pain (R. 699-723). These sessions constitute the only formal mental health treatment Plaintiff received. On January 24, 2014, Plaintiff underwent a mental status examination with a state agency consultant, during which Plaintiff reported that he had experienced depression due to pain and legal battles over workmen's compensation benefits. (R. 726-29). Plaintiff acknowledged considering suicide when his pain was very bad, but reported that he had made no attempts and had not felt that way in a few weeks. *Id.* Plaintiff's

---

[2] The medical record from this October 20, 2015 Silver Cross emergency department visit is not part of the administrative record. To the extent the Court knows about this visit, it is from the Presence Saint Joseph Medical Center notes at R. 837.

mental status examination was otherwise unremarkable, as his concentration and attention appeared to be within normal limits; his fund of knowledge was grossly intact; he had no difficulty performing calculations; and he was fully oriented. *Id.* Ultimately, John Brauer, Psy.D., diagnosed Plaintiff with an adjustment disorder with depressed mood. *Id.*

### c. The ALJ's Decision

The ALJ issued a written decision on January 7, 2016. (R. 20-32). The ALJ found that Plaintiff met the insured status requirements of the Act through September 30, 2016. (R. 22).

At step one, the ALJ found that although Plaintiff had some earnings post-December 30, 2011, he had not engaged in substantial gainful activity from the alleged onset date of December 30, 2011 through his DLI. *Id.* At step two, the ALJ concluded that Plaintiff had the severe impairments of: cervical stenosis and degenerative disc disease; lumbar degenerative disc disease; and obesity. *Id.* Plaintiff's right shoulder impairment and his adjustment disorder were determined to be non-severe. (R. 22-23). At step three, the ALJ concluded Plaintiff did not have an impairment that met that met or equaled the severity of one of the listed impairments, including Listing 1.04, of 20 CFR Part 404, Subpart P, Appendix 1. (R. 25). Prior to step four, the ALJ found that through his DLI, Plaintiff maintained the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) except occasional climbing and kneeling, and frequent but not constant stooping. (R. 26). At step four, the ALJ concluded Plaintiff was capable of performing his past relevant work as a sales representative. (R. 31). Because of this determination, the ALJ found Plaintiff not disabled under the Act. (R. 32).

## II. Social Security Regulations and Standard of Review

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; and (3) whether the severe impairment meets or equals one considered conclusively disabling such that the

4

claimant is impeded from performing basic work-related activities. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920(a)(4)(i)-(v). If the impairment(s) does meet or equal this standard, the inquiry is over and the claimant is disabled. 20 C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ must determine (4) whether the claimant is capable of performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). If not, the ALJ must (5) consider the claimant's age, education, and prior work experience and evaluate whether she is able to engage in another type of work existing in a significant number of jobs in the national economy. *Id.* At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the claimant's RFC in calculating which work-related activities she is capable of performing given his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to the Commissioner to show there are significant jobs available that the claimant is able to perform. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

In disability insurance benefits cases, a court's scope of review is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young v. Barnhart*, 362 F.3d at 1001. Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). The Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also*, 42 U.S.C.§ 405(g).

**III. Discussion**

The Plaintiff alleges the ALJ made reversible errors in two areas: Plaintiff's RFC finding and the assessment of Plaintiff's subjective statements. The Court addresses these issues in turn.

**a. The ALJ Did Not Err in Her RFC Assessment**

Plaintiff takes issue with three aspects of Plaintiff's RFC assessment: 1) the ALJ's evaluation of Plaintiff's standing and walking limitations; 2) the ALJ's evaluation of Plaintiff's limitations in social functioning, and concentration, persistence, or pace; and 3) the ALJ's evaluation of Plaintiff's limitations in the use of his hands and arms. The Court finds error in none of these areas.

**i. Plaintiff's Ability to Stand and Walk**

In assessing Plaintiff's ability to stand and walk, it seems Plaintiff's main argument is that the state agency consultants rendered their opinions without considering a later-taken x-ray and that the ALJ did not obtain an updated medical opinion based on this later-submitted evidence. The x-ray in question was taken in October 2015 when Plaintiff went to the Present Saint Joseph Medical Center emergency department complaining of lower back and hip pain that began a week earlier after he had done some yard work and some lifting. (R. 837). The x-ray showed extensive lumbar spondylosis. (R. 841).

The ALJ ultimately found that Plaintiff had a severe impairment of degenerative disc disease of the lumber spine, and acknowledged that the October 2015 x-ray revealed extensive lumbar spondylosis. (R. 22, 28). In fact, the Court finds the ALJ specifically considered the x-ray result in her decision, noting its existence twice and explaining it contextually with other opinions of record. (R. 28, 30-31). Moreover, and perhaps most directly countering Plaintiff's point, this x-ray result does not address Plaintiff's functional limitations, nor does the x-ray address Plaintiff's condition at the time the state agency reviewers offered their opinions. See *Collins v. Barnhart*, 114 F. App'x 229, 234 (7th Cir. 2004) (existence of conditions alone does not prove the conditions so functionally limited claimant as to rendered her completely disabled during the relevant period). Therefore, the Court finds it reasonable the ALJ did not seek an updated medical opinion based on this x-ray. This is particularly true in this case where the ALJ

noted that Plaintiff testified at the hearing and repeatedly informed treating sources that he often played golf throughout the alleged period of disability as it "involves significant twisting and extension of the neck, shoulders, arms and hips," contextual evidence the ALJ determined belied Plaintiff's alleged functional limitations, irrespective of the x-ray result. (R. 24, 30).[3,4] The Court finds that a reasonable mind might accept this evidence as adequate to support the ALJ's conclusions about Plaintiff's ability to stand and walk. The Court declines to remand on this basis.

### ii. Plaintiff's Social Functioning, and Concentration, Persistence, or Pace

The next area of Plaintiff's RFC to which Plaintiff objects is the ALJ's evaluation of Plaintiff's limitations in the domains of social functioning, and concentration, persistence, or pace.

With respect to these aspects of the RFC, the ALJ detailed that Plaintiff's concentration and attention were normal when tested, and that he was fully oriented at the consultative exam. (R. 24, 728; *see also*, *e.g.*, 463 (fully oriented and pleasant), 467 (same), 477 (same), 615 (fully oriented, normal cognition), 757 (alert, oriented, cooperative), 787 (alert, oriented, normal behavior), 853 (fully oriented, normal mood and affect)). The ALJ noted that the results of Plaintiff's state agency psychological exam were largely normal, with normal concentration and attention, intact fund of knowledge, and no difficulty performing calculations. (R. 23, 728). The ALJ detailed that with regard to social functioning, although Plaintiff testified that he was "short" with people, the record did not demonstrate difficulty getting along with others or with medical providers and that Plaintiff still participated in regular social activities with

---

[3] The ALJ cited *much* evidence on this point. *See* R. 27, 72 (in the summer after his neck surgery, Plaintiff played golf about 10 times, playing 18 holes each time), 356 ("Patient reports he was able to golf a few times while on vacation."), 383 ("Patient reports he did hit some chips with his wedge at the driving range."), 415 ("Patient states that he played 13 holes of simulated golf last night…He states that his doctor Lorenz told him to try and play golf and he did. He was only able to play 13 holes."), 709 ("He also went with friends golfing + tailgating + had a good time"); *see also* R. 619 (reporting going to the gym three to four times a week and occasionally playing golf), 727 (reporting that he played indoor golf once a week with friends), 776 (noting use of tobacco when having "cigars on the golf course"), 852 (same).

[4] As to other contextual evidence the ALJ determined belied Plaintiff's alleged functional limitations, the ALJ also considered that the functional capacity evaluation ("FCE") indicated Plaintiff could walk for seven to eight hours per day (R 27, 583, 588); that consultative examiner Dr. Seth Osafo, M.D. observed Plaintiff to have a normal gait and no difficulty walking, and opined that Plaintiff experienced no limitations in his ability to sit, stand, walk, carry, or handle objects (R. 28, 612, 615); and that both state agency physicians opined that Plaintiff could stand and/or walk for about six hours during an eight-hour workday. (R. 28-29, 97, 112).

his friends. (R. 24, 709, 728). The ALJ also noted that Plaintiff attended four counseling sessions in October 2013, and received no other formal mental health treatment. (R. 23, 707-12).[5] The ALJ further considered the opinions of the state agency psychologist who opined that Plaintiff had only mild limitations in the "Paragraph B" criteria and no episodes of decompensation, and did not indicate that Plaintiff experienced any work-related limitations. (R. 109). The ALJ concluded that this evidence of Plaintiff's mild limitation in the domains of social functioning, and concentration, persistence, or pace did not demonstrate work-related limitations, and thus included none in her RFC. We find that the ALJ at least minimally articulated her reasoning for the same. *See Clifford*, 227 F.3d at 870.

The Court finds no error in the ALJ's consideration of this evidence or her reasoning for not including these limitations in her RFC because the Seventh Circuit has recognized that "a mild, or even a moderate, limitation in an area of mental functioning does not prevent an individual from functioning satisfactorily." *Sawyer v. Colvin*, 512 F. App'x 603, 611 (7th Cir. 2013) (signals and citations omitted). Here, Plaintiff points to no evidence that he had any work related mental limitation other than his own assertions he was irritable. (Dkt. 12, p. 7-9). In fact, no doctor opined that Plaintiff experienced any mental limitations on his ability to work.

Finally, as part of his social functioning, concentration, persistence, or pace arguments, Plaintiff points to a job description from the Occupational Information Network ("O*NET") and speculates that his mild mental limitations would not have allowed him to perform his past occupation of a Sales Representative. (Dkt. 12, p. 7-8). While the Commissioner is correct to point out that Plaintiff's counsel could have yet failed to question the VE at the administrative hearing about the impact any mental limitations would have had on Plaintiff's functioning in a particular occupation, the Court has identified a bigger problem with Plaintiff's argument: Plaintiff's entire argument on this point based upon the

---

[5] The Court also notes that initially Plaintiff did not even claim depression as a limitation on his March 19, 2013 Disability Report when he listed "all of the physical or mental conditions (including emotional or learning problems) that limit your ability to work" as "torn biceps muscle/herniated disc in neck c3 c4 c6 c7." (R. 271-79 at 272.)

8

O*NET job description of a Sales Representative when O*NET has not been adopted by the Social Security Agency. On this point, the Agency has explained:

> The Department of Labor (DOL) developed the DOT in the late 1930s to match jobseekers to jobs. For almost 50 years, the DOT has been our primary source for occupational information. The DOL discontinued updating the DOT in 1991, and replaced it in 1998 with another job placement tool, the Occupational Information Network (O*NET). We studied whether O*NET could take the DOT's place in our disability adjudication process but found it does not describe the physical requirements of occupations at the level of detail needed for claims adjudication.

https://www.ssa.gov/disabilityresearch/ois_project_faqs.html (last visited on June 28, 2018); *see also*, *Moffit v. Berryhill*, 2018 WL 276770, at *6-7 (D. Kan. Jan. 3, 2018) (discussing the agency's decision not to adopt the O*NET and instead develop an Occupational Information System); and *Ragland v. Berryhill*, 2018 WL 1757656, at *11 (E.D. Wis. Apr. 12, 2018) (collecting cases rejecting the notion that a VE's testimony must be consistent with O*NET's skill levels). Plaintiff has cited outdated case law on this point. The Court will not further address Plaintiff's argument based on O*NET except to say that Plaintiff has not established that the ALJ's decision compels reversal on this point. (We have already addressed how the ALJ minimally articulated her reasoning for not including any mental limitations in the RFC, and we therefore do not find the ALJ had to ask the VE about any mental limitations.)

Based on the foregoing, the Court finds the ALJ's opinion supported by substantial evidence as it relates to Plaintiff's limitations in the domains of social functioning, and concentration, persistence, or pace, and will not overturn the ALJ's decision on this basis.

### iii. Plaintiff's Use of His Hands and Arms

The final area of Plaintiff's RFC with which Plaintiff takes issue is the ALJ's evaluation of Plaintiff's limitations in the use of his hands and arms.

In addition to the numerous neurologic exams and multiple mentions of Plaintiff golfing already discussed above, the ALJ also considered Plaintiff's functional capacity evaluation ("FCE"), which demonstrated no fine motor or gross manipulation limitations. (R. 27, 588). The ALJ also considered other medical evidence related to Plaintiff's arms and hands. Specifically, in October 2012, Plaintiff's

9

orthopedist, Dr. Mark Lorenz, M.D., opined that Plaintiff could lift 20 pounds and that he had excellent strength in his arms. (R. 27, 576, 441 ("He has excellent grip strength…His hands are functioning fine as well.")). Consultative examiner Dr. Seth Osafo, M.D. observed in May 2013 that Plaintiff had full range of motion in his shoulders, arms and hands, full grip strength, full muscle strength, and no problems performing fine or gross manipulation. (R. 28, 608-09, 611, 614). Dr. Alzoobi recorded that while Plaintiff had "on and off" radicular symptoms in his right arm, he had no significant motor deficit. (R. 27, 694). Upon seeking a second opinion with Dr. Khan, Plaintiff's neurological exam was still normal with full strength and normal reflexes. (R. 28, 779). Nonetheless, Plaintiff underwent cervical surgery in January 2015, and by February 2015 he reported to Dr. Khan that he had no problems with his arms. (R. 28, 791). That same month, Plaintiff also reported to his physical therapist that he no longer had any left arm symptoms. (R. 28, 767). When he was discharged from physical therapy in March 2015, he was able to reach overhead to retrieve items. (R. 28, 765). The ALJ weighed this subjective and objective evidence, as is her purview, and concluded that no arm/hand limitations were necessary as part of Plaintiff's RFC.[6] We find the ALJ reasonably articulated her reasoning on this point and we are able to follow the logical bridge she created from this evidence to her conclusion. Thus, this aspect of her decision is supported by substantial evidence and must be upheld.

**b. The ALJ Did Not Err in Her Subjective Symptom Evaluation**

Plaintiff also takes issue with the ALJ's subjective symptom evaluation. Part of the Plaintiff's arguments regarding his subjective symptom evaluation center on the applicability of SSR 16-3p, which is inapplicable in the instant matter. Instead, SSR 96-7p, 1996 WL 374186 (July 2, 1996), applies to the

---

[6] Plaintiff also asserts that the VE testified that an individual would be unable to perform the job of a sales representative if that person were limited to occasional reaching, handling, and fingering. (Dkt. 12, p. 10). This is a misstatement. Rather, the VE testified that Plaintiff could still perform his past relevant work as a sales representative as it is generally performed in the economy, even if he were limited to only occasional overhead reaching, occasional fingering, or occasional reaching, handling, and fingering, but he would not be able to engage in *the specific sales representative position he held as performed*. (R. 85-86). Thus, even if the ALJ had included hand and arm use limitations in the RFC, Plaintiff would nonetheless be able to perform the general occupation of sales representative, his past relevant work. As we do not find error in this arena, we do not need to address whether that error was harmless.

ALJ's credibility determinations in the instant matter.

In 2016, the Commissioner rescinded SSR 96-7p and issued SSR 16-3p, eliminating the use of the term "credibility" from the symptom evaluation process, but clarifying that the factors to be weighed in that process remain the same. *See* SSR 16-3p, 2016 WL 1119029, at *1, *7 (March 16, 2016). The ruling makes clear that ALJs "aren't in the business of impeaching claimants' character," but does not alter their duty to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original). However, the Social Security Administration recently clarified that SSR 16-3p only applies when ALJs "make determinations on or after March 28, 2016," and that SSR 96-7p governs cases decided before the aforementioned date. *See* Notice of Social Security Ruling, 82 Fed. Reg. 49462, n. 27 (Oct. 25, 2017). Here, the ALJ issued her decision on January 7, 2016. (R. 37). Therefore, SSR 16-3p does not apply retroactively and the ALJ properly applied SSR 96-7p. The Court will analyze the remainder of Plaintiff's complaints about the ALJ's evaluation of his subjective symptoms pursuant to SSR 96-7p.

According to SSR 96-7p, "[i]n determining the credibility, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements, information provided by treating or examining physicians or psychologists or other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." 1996 WL 374186 at *1. The Ruling goes on to say that a "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*

An ALJ's findings about the reliability of a plaintiff's testimony and allegations regarding his symptoms are entitled to great deference, and they should be upheld unless patently wrong. *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017); *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007). Reviewing

11

courts examine whether a credibility determination was "reasoned and supported…It is only when the ALJ's determination lacks any explanation or support that we will declare it to be '"patently wrong,"' and deserving of reversal. *Elder*, 529 F.3d at 413-14 (citation omitted). An ALJ complies with SSR 96-7p (and 16-3p), and the court will affirm her finding, so long as she "gives specific reasons that are supported by the record." *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

Here, the ALJ properly considered the factors set forth above and provided specific and well-supported reasons for her conclusions with respect to Plaintiff's subjective assertions about his symptoms. As discussed above, the ALJ detailed how Plaintiff often played golf throughout the alleged period of disability, *see* fn. 3, *supra*, which was inconsistent with his assertions concerning the severity of his symptoms and limitations caused by cervical and lumbar spine impairments. (R. 24, 30). While Plaintiff testified he did have to cancel 10% of his golf games due to his symptoms, the ALJ considered that the golfing he did engage in was inconsistent with his alleged functional limitations as it "involves significant twisting and extension of the neck, shoulders, arms and hips." (R. 30, 77). The Court does not find any error on the ALJ's part that she did not seek more particulars about Plaintiff's golf habits as there was sufficient evidence in the record to suggest that the golfing Plaintiff engaged in was largely golf as it is commonly understood and not miniature golf, frisbee golf, or virtual golf.

The ALJ also discussed how the record contained the observations of and examinations by medical professionals that either did not support Plaintiff's assertions regarding his limitations, or detailed the success of treatments in treating Plaintiff's complaints. (R. 30; SSR 96-7p). *See Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) (noting that "discrepancies between the objective evidence and self-reports may suggest symptom exaggeration."). The ALJ pointed to treating physician Dr. Lorenz's records reflecting that while Plaintiff complained of pain, he had a full cervical range of motion, normal neurological findings, and excellent strength. (R. 30, 441). The ALJ also detailed that at the May 2013 consultative examination, Plaintiff demonstrated a full range of motion in the cervical and lumbar spine, normal grip strength, normal muscle strength, and no problems with fine or gross manipulation. (R. 30).

12

The ALJ's discussion of the FCE (where Plaintiff put forth submaximal effort)[7] further supports her conclusions discounting Plaintiff's subjective assertions, as does her discussion of Dr. Khan's records reflecting Plaintiff's excellent recovery after surgery. (R. 27-28). Similarly supportive of the ALJ's conclusions regarding Plaintiff's subjective statements is that Dr. Alzoobi's records reflected positive and long-term improvement from a nerve block and radiofrequency ablation, and Dr. Khan's records stating that Plaintiff experienced quick improvement after surgery and ultimately significant improvement by the time Plaintiff was discharged from physical therapy the month after his surgery.[8] (R. 30, 628, 634, 638, 695, 765, 791). The ALJ specifically noted, in relation to Plaintiff's functional abilities, that the physical therapy notes detailed how "[p]atient has met all goals" and "[c]ervical pain 0/10." (R. 30, 765). Thus, the ALJ gave specific reasons that are supported by the record for her credibility findings; the ALJ appropriately and reasonably considered that the medical evidence did not support Plaintiff's subjective complaints. *Skarbek*, 390 F.3d at 505. "Not all of the ALJ's reasons must be valid as long as *enough* of them are." *Halsell v. Astrue*, 357 Fed.Appx. at 722-23 (emphasis in original). The Court is satisfied with the ALJ's analysis and reasoning therefore, and finds that the ALJ's conclusions regarding Plaintiff's subjective symptom statements and credibility are supported by substantial evidence. Therefore, the ALJ's credibility assessment is not patently wrong, and we will not reverse it. *See Elder*, 529 F.3d at 413-14.

Next the ALJ questioned the reliability of Plaintiff's assertions of lower back pain because he did not seek any regular treatment for his purported symptoms for most of the relevant period. (R. 30). On this point, Plaintiff argues that the ALJ impermissibly considered his failure to seek treatment for his lower back pain without inquiring about the reasons for this failure. This is somewhat of a

---

[7] "ALJs may use lack of effort on evaluations of limitations to undercut credibility." *Avery v. Astrue*, 2012 WL 6692120, at *10 (N.D. Ill. Dec. 19, 2012) (citing *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002)).

[8] Plaintiff also argues that the term "improvement" does not relate to a specific functional capacity or ability to sustain full-time employment. While this argument is an interesting one, the cases cited by Plaintiff are not Social Security disability cases. Moreover, the Court finds persuasive the Commissioner's argument that the ALJ considered Plaintiff's positive response to his treatment in the context of the evidence, which *did* reflect Plaintiff's functional abilities.

13

mischaracterization of the evidence on Plaintiff's part, however, as he did seek treatment for his lower back after working and lifting in his yard in October 2015, which the ALJ mentioned. (R. 30, 837). In fact, the record bears out that Plaintiff regularly sought treatment for his other complaints and obtained treatment and successfully addressed those complaints, and only sought treatment for lower back pain on two occasions in the same week after he sustained a lumbar strain following some yardwork and lifting. (R. 837). Therefore, this is neither a noncompliance matter, nor one where Plaintiff failed to seek treatment at all; the Court is not convinced the ALJ even needed to delve into the reason(s) that Plaintiff's sought low back treatment on only these two occasions while he was regularly obtaining other medical treatment. This is a far different scenario than the usual context where a claimant fails to seek treatment and the ALJ must address the same. *See, e.g., Vargas v. Comm'r of Soc. Sec.*, 2015 WL 328110, at *11 (M.D. Fla. Jan. 26, 2015) (in addition to considering the impact of any mental illness, "good reasons for not seeking medical treatment include, but are not limited to, inability to afford medical care, aversion to side-effects of treatment, unavailability of any effective treatment options, and religious opposition to medical treatment.") (citing SSR 97-7p).[9] In light of this, the Court does not find error on the ALJ's part in considering that Plaintiff's lower back complaints were not so severe as to prompt him to obtain treatment with the exception of the visits occasioned by his yardwork-induced lumbar strain in October 2015.

Finally, Plaintiff asserts the ALJ erred in failing to consider the side effects from his medications. Setting aside the fact that at the time of the administrative hearing, Plaintiff testified that he was no longer regularly taking medication, the Commissioner is correct that Plaintiff's treatment records do not reflect any complaints by Plaintiff about his medications. Plaintiff's main thrust behind this "side effects" argument is the statement from his self-executed Function Report that he is angry and irritable that he

---

[9] Even in his reply, Plaintiff does not point to any record detailing the reasoning for Plaintiff's failure to seek additional lower back care, nor does he assert that any of the "good reasons" listed in SSR 97-7 might conceivably be applicable.

has to take Vicodin as prescribed. (Dkt. 12, p. 15, R. 294). As to this statement, the Court finds the Commissioner is absolutely correct that "Plaintiff's anger at needing to take medication is not the same as a side effect from the medication." (Dkt. 14, p. 14). Similarly, Plaintiff complains that the ALJ should have considered that Plaintiff has been advised not to drive a forklift due to his prescribed Vicodin use. This is likewise not a side effect of the medication. (Moreover, on this point, the ALJ found that Plaintiff was able to perform his past occupation of Sales Representative, a position which does not typically require forklift use.) The only assertion Plaintiff makes of a potential medication "side effect" is that he has problems getting along with others because the "medicine has changed my personality." (R. 299). However, the ALJ specifically considered this assertion of difficulty getting along with others and detailed how the record as a whole did not support such self-reported difficulties. (R. 24). The ALJ ultimately adopted the state agency reviewer's opinion that Plaintiff had only mild difficulties in maintaining social functioning. We find no error with respect to the ALJ's analysis of any alleged "side effects" of Plaintiff's medications.

For the reasons above, the Court concludes that each aspect of the ALJ's subjective symptom evaluation is supported by substantial evidence and will not overturn the ALJ's decision on this basis.

## CONCLUSION

For the foregoing reasons, the Commissioner's Motion for Summary Judgment (dkt 19) is granted and Plaintiff's motion (dkt 12) is denied. The final decision of the Commissioner is affirmed.

Entered: 7/25/2018

_____

U.S. Magistrate Judge, Susan E. Cox